Good morning, Your Honors. May it please the Court, Harry Chamberlain. With me is co-counsel John Marshall, who is the trial court counsel in the District Court on behalf of Davies Lemmis Raphaely Law Corporation and its members. I'll refer to the those lawyers as the Davies firm or the insurers this morning. May it please the Court, contrary to the District Court's ruling, seven separate real estate investment lawsuits that were brought in state court, five of which are still pending against the Davies firm, all brought by different investors involving 23 separately negotiated transactions. That's my counsel on both sides. Separate transactional documentation prepared by the Davies lawyers over the course of six years, from 2003 to 2009, do not reflect the different policies of liability insurance that these insurers purchased from Liberty. Liberty's position and the summary judgment that was granted by the District Court ignores basic rules of California contract interpretation, including the teaching of the controlling precedent with regard to interrelated claims in California, the Bay Cities case, which was argued a generation ago, a case in which I participated. I remember it well. The policy must be read as a whole. The policy must be applied according to its common sense meeting. And because the duty to defend, and that's the duty to defend any single claim, that's the duty to defend any multiple claim, is broad, and it's broader than the duty to indemnify, it depends on potential coverage. So we're talking about the potentialities of what could be not only what's actually pleaded, Liberty's position seems to be a four corners argument, that you look at the four corners of the complaint, if it's not in there, it's not covered, and actually will demonstrate, I believe, and have demonstrated in the District Court, that even the allegations of the claims are significant, significantly and substantially different, and at least potentially covered, subject to the duty to defend, under the express terms of this agreement, which would continue, the defense of each of these claims should continue until it has been admitted or adjudicated that the claims are completely the same, according to Liberty itself. In its own policy, it promises to defend fraudulent, criminal, malicious, deliberately wrongful acts or omissions, quote, we will defend allegations of the foregoing acts or omissions until the time that they are finally adjudicated or admitted by you. That's page 338 of the record. Liberty agrees with us that professionals, like the Davies Firm's transactional lawyers, purchase professional liability coverage every year, because when they come to work to do their jobs, if there's a real estate market crash and disgruntled investors in a handful of transactions that they've been involved in documenting and negotiating, sue them, they will be covered for that from year to year. And when multiple claims arise in separate policy years, they expect to be covered up to the per claim and aggregate limits of those coverages each year. Commentators over the last 30 or 40 years who've talked about the Basity's case, talked about interrelated claims, have said, wow, by the labels that the courts place on whether something is similar or the same, related or unrelated, it can produce absurd and extreme results. In this case, it doesn't have to. The controlling precedents are Bay Cities, and this court's decision 10 years ago in financial management advisors, a financial management investment case. In that vein, the most recent case that comments on all of this development of Bay Cities is the decision from the Utah District Court, which has come down within the past year, which comments on this case, comments on the Liberty case and its approach to this common scheme or modus operandi theory. And it's funny, the modus operandi, which I find Latin's not too good, but means method of operation or your way of doing business, the courts have commented on that investment or professional liability realm. Modus operandi is your way of doing business. And one of the commentators, Mr. Zolke, says in arguing that claims are common to a modus operandi, parties need to be careful to characterize that modus operandi narrowly, rather than in an extremely broad fashion, extremely broad fashion as Liberty's done here. For example, an attorney should avoid alleging the insurer's modus operandi was to fail to provide services that under that theory, virtually any suit against the insurer would be related and a court would be unlikely to adopt such an expansive interpretation. And this court should not have adopted that kind of expansive interpretation because it wasn't warranted here. Among the many differences, the Morgan case talks about treating a single claim, if they're factually and legally distinct as these are, so that the relationship between the two becomes so attenuated that an objectively reasonable insurer could not have expected that they would be treated as a single claim under the policy, we don't apply them as related or interrelated claims. The court commented on this court's decision in the financial management advisor's case, where this court declined to find that claims were interrelated, quote, whenever two parties are advised to invest in the same fund, or both claimants blame the same financial advisor. We don't remotely have that here. We have 23 separate investments. We have seven separate ballparks in which the individual investors, according to a 34-page declaration that Mr. Davies submitted in opposition to this motion for a summary judgment with hundreds of pages of backup, points out the many differences. The courts, in the cases that we've digested, the financial investment cases, the financial professionals' cases, the lawyers' and accountants' cases, basically focus on four things in determining this interrelationship. One is, do we have the same claimants? Here we don't. They're different. They're different claimants who claim that they've suffered different injuries and in different ways. We look at the timing of the investments and the transactions. Are they the same or are they different? They're all different. We look at a causal element. Bay Cities applied a causal or logical test. It did that because there was an absurd result, an extreme result in that case that the insurance industry objected to. And we argued about that. Focusing on the primary rights of each individual client or each individual investment plaintiff, what was the causal effect? Well, there you had one client who wanted to collect a construction debt, but there were two theories and there were more damages than a single policy limit. So the argument was, gee, either of these two things, the failure to record a mechanics lien or the failure to record the stop notice or something else might have triggered an additional claim. Well, it's one debt. So, counsel, what the district court found persuasive was that each of the seven underlying actions alleged a similar scheme where the defendants made a false representation to plaintiff investors that the sellers would pay all the commissions related to the transaction, when in reality the purchase price of the property was marked up so that they were actually paying the commission. And that is a common allegation in each of the lawsuits, correct? It is one common allegation, Your Honor, which was refuted conclusively in the Stella action, which was reported here in the middle of last year. I think it was decided within a day or two of our last brief early this year. We don't look at the end result in the case. We look at the allegations in the complaint, don't we? And I understand that that's what Liberty argues. Well, the language of our policy says alleged. That's what claim means. It means something that's alleged or asserted. So, yes, we do look at the outcomes. And here's what the courts have said about that. In particular, the — here's what the Stella case said about that. We quoted it in our supplemental letter a couple of weeks ago. The Stella case talked about this commission fraud, and the specific thing that the district court pointed to at page 49 was seven underlying actions, and that includes the Stella case, which was never certified as a class action. There wasn't commonality. He invested in different transactions. We can illustrate that for the court. Involve a similar alleged scheme. That is, in the course of negotiating property acquisition transactions, the defendants made a false representation to plaintiff investors that sellers would pay all commissions relating to the transaction when, in reality, the purchase price of the property was marked up to include a commission payment. And here's what Stella said. It's also what the trial court said when it dismissed that claim as being without merit. The plaintiff investors were given explicit notice that the commissioned figure had been added to the price the seller would have accepted for the property. Thus, Stella's allegations fail as a matter of law. So at — The counsel — Yes, Ron. Judge Gould, if I can interject a question. It might be a little different, but it's related to the same idea whether there's some common scheme or common practice that covers all the cases. So my question is this. Were all these plaintiffs in all the separate suits, were they all clients of the Davies Farm? They were not, Your Honor. I know some claimed that they were, and that's another difference in this. In fact, if I could highlight for the court what some of these are, they're securities violations, licensing violations. For example, AMLAP alleges that we should have known, the lawyer should have known, that the tenant in common interests were not being promoted by a registered broker-dealer in violation of NASD and SEC rules. But there are other different allegations, different than the commission allegations. McCready and Johnson alleged that the firm in producing its offering memoranda represented that long-term lease prospects — these are commercial buildings, basically, that are leased — including a key tenant, Bank of America, were good for renewal. And according — that was supposedly a material representation other than this commission scheme. Cherning, the sale of the Robertson property. Ahern, a separate plaintiff, claims that the Davies Firm violated fiduciary duties in connection with that transaction owed direct duties because they were repeat investors. Well, that's contested. The lawyers don't represent them. They represented sponsors and people who were negotiating on that side of putting these investment deals together. And they were separately represented by counsel, the buyers and sellers, in the course of those negotiations. There were allegations about the suitability of investments. The Barron's amended complaint, for example, alleged that duties were violated concerning the tenant and common investments because there was no suitability review. And that wasn't dealt with in the — Yes. Let me serve up a question about one of the things that was on my mind so you can address it. That is, OK, if all the plaintiffs were not clients of the Davies Firm, were most of them Davies Firm's clients? No, Your Honor. So, Ed, were the businesses that they invested in, were they represented by the Davies Firm? The businesses that were invested in, so were the investments — actually, the Davies Firm AMC, which is Asset Management Consultants and some of the principals and some related entities, were regularly the sponsors. Those were the — putting together the limited partnership investments, these investments were being sponsored and developed and promoted, and the lawyers were handling transaction documents and promotional materials for those who were sponsoring these investments and were, at times, managing aspects of these investments, too. So those were the direct clients. And so the third-party beneficiary arguments that are being made, there are direct attorney-client arguments that are being made. Let's go back to the Stella case, 8 Calap 5th at pages 184 through 188. Specific allegations of the 41 investments that Mr. Stella, himself a lawyer who did not allege he had an attorney-client relationship — he knows better, he's a lawyer — he did not allege that. Those separate transactions were documented and detailed. There are a number of different investments that are described in the Stella case, the Hamilton investment, limited partnership, the Baker and Overland and Wynaldi investments, and those aren't anywhere in anybody else's claims or lawsuits. The AMLAP property involved a single investment in September 2006, and there were claims about the loss of a tenant in allegedly misrepresented reserve accounts having nothing to do with commissions. The Ahern complaint about the churning of the Robertson property. Wait a minute, you know, you were leading us down the path by trying to get additional fees so you could promote different investments. That was an allegation. It has nothing to do with commissions, the refuted claim. Moreover, Your Honor, these are a handful of disgruntled investors all represented by the same lawyer who does have a boiler plate complaint alleging various things that aren't even the same from case to case, and even the investments that are subject of dispute turn out to be tremendously profitable tax-advantaged investments. As Mr. Davies described, the Templin-Robertson properties earned over $9.4 million for the investors. The Prairie transaction made $4.3 million. The Fairgrounds transaction made $1.7 million. Why do these individuals sue from 2011 to 2013? As one of my partners says, everything old is new again. You have real estate ups and downs. You had a market crash in the late 2000s. The real estate market crashed. It became difficult to get financing, and it became difficult to get the values that these investors wanted, and a handful of them, not many, in the hundreds and hundreds of transactions that were handled during this six-year period, multiple transactions, dozens more than this, that turned out to be profitable. A few investors who were disgruntled, didn't make money, which is a risk of investing, complained that the lawyers and the accountants and anybody else involved should be financially held to account and should reimburse their individual and separate damages. Both the Financial Management Advisors case and, again, more recently, at pages 1334 and 1335, it discusses the timing and the individual loss aspects of each investor claim. In that case, there were two investors, a husband and wife, and each of them had different losses, and each of them had different claims, even though they were put into the same three investment vehicles, according to the common scheme and common plan argument, the very argument that we're going to hear. All right, counsel, you're over your time, so thank you very much. I thank the Court. Good morning, Your Honors. May it please the Court. Matthew Burke, on behalf of Liberty Insurance Underwriters, Inc., this case concerns the scope of coverage under professional liability policies issued by Liberty to Davies-Lemes. As you've heard, there were seven underlying lawsuits there at issue. When the first was filed in 2011, Liberty provided a defense to Davies-Lemes. When the second lawsuit was filed, Liberty evaluated that claim, applied the policy provisions, and arose out of the same or related wrongful acts, and therefore constituted a single claim that would be subject to a single-each-claim limit of liability. As each of the subsequent seven lawsuits were filed, Liberty did the same analysis, came to the same conclusion, based on the same course of conduct that was alleged against Davies-Lemes, and advised Davies-Lemes of the same position. Over years, Liberty paid over $1.1 million to defend Davies-Lemes in these seven lawsuits. In 2015, as the full extent of the single-claim limit of liability was nearing its end, Liberty exercised its right to file a lawsuit seeking a declaration that its interpretation of the policy was correct. The operative language in the policies is as follows. Claims alleging, based upon, arising out of, or attributable to, the same or related wrongful acts shall be treated as a single claim. The district court applied that language according to its plain meaning, determined that the seven lawsuits constituted a single claim, and was subject to a single-each-claim limit of liability. This appeal presents two questions. First, is that same course of conduct that's alleged that Davies-Lemes engaged in across those seven lawsuits constitute the same or related wrongful acts? And second, in answering that first question, was the district court correct in looking to the allegations of the underlying lawsuits to make that determination? There's no dispute that California law controls here, and there's no dispute as to what the standard is, and that is whether the claims are the same or logically connected. And here, that standard is met, because it is the same course of conduct that Davies-Lemes is alleged to have acted in across all of these seven lawsuits. As Judge Warlaw mentioned, the basic scheme alleged in these cases was that a representation was made that the sellers of the properties at issue would bear the cost of commissions and fees, when in reality it was alleged that the purchase price was marked up to account for those fees and costs. That was a key allegation in the scheme to misrepresent, to get these investors to invest in the property. And that is because for all of these plaintiffs, low upfront costs was key to the investment, whether it was a limited partnership investment or a tenant-in-common investment. They also listed the leasing status and tenant status of various properties. The common element there is that it was all done to make the properties look more attractive to the investors. And as to Davies-Lemes itself, the allegations are that they participated in the preparation of the offering documents, they were aware of these misrepresentations, and they failed to disclose them. With the exception of the Stella action, all of the other six actions do allege that Davies-Lemes had an attorney-client relationship with the plaintiffs. They also allege that Davies-Lemes had an attorney-client relationship with the promoters of the investments. The allegations are that Davies-Lemes failed to adequately disclose that joint representation, failed to obtain an informed consent and waiver, and favored the interest of the promoters over those of the plaintiffs. It was also alleged by the plaintiffs that they failed to adequately advise the plaintiffs, including encouraging them to enter into special purpose entities for purposes of these investments, which limited their rights. Now, the focus of the language here is the wrongful acts. You've heard discussion about multiple plaintiffs, about multiple properties, about allegations against other defendants, but the key here is, according to the terms of the policies, same or related wrongful acts. And this conduct, and so the focus is on Davies-Lemes. It's not on the other defendants in the case, because there were, the promoters were named as defendants, the accountants were named as defendants, the brokers were named as defendants, but the focus is on what Davies-Lemes is alleged to have done. And here, the broad clause easily encompasses that single course of conduct that's alleged to have been engaged in by Davies-Lemes. First, the language talks in terms of same or related wrongful acts, so obviously they don't need to be identical. Second, the Bay City's court decided that related would be interpreted as logically connected. And clearly, based on that single course of conduct, the allegations against Davies-Lemes in each of the seven lawsuits is logically connected. This is not a provision that limits coverage. This could just as easily be an insured arguing that multiple lawsuits were the same or related for purposes of avoiding multiple deductibles, and the Bay City's court determined that the same or related language was unambiguous, and therefore the district court applied the plain meaning of the clause and came to the conclusion that it did. Now, as I said, none of the differences that have been discussed, either in the briefing or here today, changes that single course of conduct that Davies-Lemes entered into. Yes, there are multiple properties at some of the lawsuits. Others are not. But again, the allegations and wrongful acts do not need to be identical. They simply need to be logically connected. And second, and more importantly, the focus is not on the impact of the conduct, but on the conduct itself. It is on what are the wrongful acts that Davies-Lemes engaged in, whether it applies all to one property or to multiple properties. Now, there was some discussion about being able to rely on the allegations in the underlying lawsuits for the district court to make the decisions that it did. Davies-Lemes takes the position that that was not appropriate. Its position is that the court should have waited for the attorney malpractice and fraud claims against Davies-Lemes to be fully litigated in the underlying actions or in this declaratory judgment action before applying the terms of the policy. That is not consistent with the terms of the clause. Obviously, in dealing with same or related wrongful acts, the focus is on the wrongful acts. That term is defined by the policy as any actual or alleged act, error, omission, or personal injury which arises out of the rendering or failure to render professional legal services. And the clause itself talks in terms of claims alleging the same or related wrongful acts. Clearly, the plain terms of the policy do contemplate using the allegations of a lawsuit to determine whether multiple claims will be treated as a single claim because they arise from the same or related wrongful acts. And not only does that make sense from a policy interpretation perspective, it makes logical sense as well. The duty to defend here is determined on the basis of allegations. Therefore, the limit to that duty to defend likewise should be determined based on the allegations. In the alternative, a district court could never make a determination about whether a duty to defend is limited by this multiple claims provision because the court would have only allegations to go on. Now, Davies-Lemes makes a second argument relying on exclusion, too, in the policies and talks about being allowed to continue a defense until claims are fully adjudicated. Now, that language appears in exclusion. That exclusion deals with, among other things, fraudulent conduct. It is not a creation of coverage. It is a limitation on coverage. There is a sentence in there that confirms the duty to defend that is provided elsewhere in the policy, but it is not a duty to defend, and saying that we will defend until the claims of fraud are fully adjudicated. Now, for two reasons, the argument that's been made by Davies-Lemes does not have merit. First, in this circuit and elsewhere, it's clear that exclusions cannot be used to create coverage. Second, and more importantly, the interpretation that's been put on that exclusion renders other parts of the policy meaningless and, therefore, violates a basic rule of construction. And by that, I mean the limit of liability provision identifies, quote, the most we will pay for damages and claim expenses for each claim. Now, under Davies-Lemes' interpretation, that provision and that amount does not limit the defense of fraud claims, but rather it's simply the time and cost to litigate those fraud claims until you reach a, quote, unquote, final adjudication. That cannot be the intent of the policy because it renders that limit meaningless. And further, there is not a single court in this circuit or in California that has declined to apply the multiple claims provision to allegations. Likewise, in this circuit and in California, in fact, it's routinely done. The XL Specialty case and the Presidio Wealth case are only two examples where courts clearly identified allegations to determine whether claims were same, whether wrongful acts, excuse me, were same or related and, therefore, subject to a single liability limit. Now, if I could turn for a moment to the second issue that's raised on appeal, and that is the district court's decision to deny our request for a stay. Because you can look at the allegations and the district court appropriately looked at the allegations of the underlying complaints in order to determine whether they were the same or related, that issue is not an issue that is before the courts here in the seven underlying cases. There is no overlap in issues. Therefore, the district court not only did not abuse its discretion in denying the stay, it handled it The stay was requested on the basis of an argument of prejudice. The district court looked at that issue and determined that there was no overlapping issues between this case and the seven underlying actions and, therefore, denied the stay. There was no request for abstention in the district court. There was no challenge to the district court's jurisdiction. As a result, the raising of abstention in this court for the first time has been waived. If the court were to take on the abstention issue, there are reasons why it should not apply. First of all, the issue here is not a presumption in favor of abstention, which is what Davies-Lemis argues. That is contrary to this circuit's decision in Governor Employer's Insurance Company v. Dysall, which says there is no presumption in favor of abstention in declaratory actions generally, nor in insurance cases specifically, which leads the court to look at the Brilhart factors, and there, again, none of those factors merit abstention in this case. First, there was no needless determination of a state law issue. As I said, there was no overlap between the issues in this case and those in the underlying case, and it is common for district courts to address state law issues in the context of insurance declaratory judgment actions. There was no forum shopping. There was no coverage case in the underlying state court actions or elsewhere in the state court system, and so Liberty had the right to seek a declaratory judgment. It chose to do so in federal court, which was good. And finally, there was no duplicative litigation. As the court found in the district court, and as is the case, there was no overlap in issues between the two sets of cases. And based on that, we would ask the court decline to abstain here, and based on the plain language of the policy, find that the district court correctly found that the underlying actions constitute the same or related wrongful acts and affirm the district court's judgment. Thank you. Thank you, counsel. This case will be submitted.
judges: Wardlaw, Gould, Collins